James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Rd.
Roseland, New Jersey  07068
(973) 994-1700

Attorneys for Plaintiffs

[Additional Counsel Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| STANLEY and DEBRA KRONBERG, individually, and on behalf of all others similarly situated, <br><br>        Plaintiffs, <br><br>        v. <br><br> DAVID LERNER ASSOCIATES INC., DAVID LERNER, ALAN P. CHODOSH, JOHN GERARD DEMPSEY JR., MARTIN LERNER, STEVEN SORMANI, APPLE REIT SIX, INC., APPLE REIT SEVEN, INC., APPLE REIT EIGHT, INC., APPLE REIT NINE, INC., APPLE REIT TEN, INC., and GLADE M. KNIGHT, <br><br>        Defendants. | Civil Action No: <br><br><br><br><br><br><br> **COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Stanley and Debra Kronberg (togerher, "Plaintiffs"), by and through their attorneys, file this class action Complaint against defendants David Lerner Associates, Inc. ("DLA"), David Lerner, Alan P. Chodosh, John G. Dempsey Jr., Martin Lerner, Steven Sormani, Apple REIT Six, Inc., Apple REIT Seven, Inc., Apple REIT Eight, Inc., Apple REIT Nine, Inc., Apple REIT Ten, Inc. and Glade M. Knight (collectively, "Defendants") on behalf of themselves and other similarly situated individuals and allege, upon information and belief, as follows:

## INTRODUCTION

1.      Defendant DLA is a New York-based brokerage firm with offices in New Jersey, Florida and Connecticut.  Defendants David Lerner, Alan P. Chodosh, John G. Dempsey Jr., Martin Lerner and Steven Sormani (collectively, the "Individual DLA Defendants") are the senior officers, executives and principals of DLA.  For at least the past seven years, DLA has served as the exclusive selling agent for offerings of shares in certain real estate investment trusts created and managed by defendant Glade M. Knight and related entities owned or controlled by him.  These real estate investment trusts are defendants Apple REIT Six, Inc., Apple REIT Seven, Inc., Apple REIT Eight, Inc., Apple REIT Nine, Inc., and Apple REIT Ten, Inc. (collectively the "Apple REITs").

2.      Over the past seven years, Defendants have engaged in an ongoing scheme to sell more than $6 billion of shares in the Apple REITs to DLA's brokerage customers, many of whom are elderly, retired and/or unsophisticated investors, by misstating the fundamental business model of the Apple REITs, omitting material information about how the Apple REITs were intended to operate, omitting to disclose material risks associated with an investment in the Apple REITS, and misrepresenting both the value of Apple REIT shares and the returns investors would receive on their investments.  For their efforts, DLA and the Individual DLA Defendants have received more than $600 million in fees and commissions (which represents 60-70% of DLA's business annually during this period) and defendants Knight and the Apple REITs have received more than $6 billion in proceeds from the offerings of Apple REIT shares.

3.      DLA and the Individual DLA Defendants, acting as agents for the Apple REITs, marketed the Apple REITs by general means such as the internet, radio, cold calling, mailings, and open invitation seminars at senior centers.  DLA brokers also made personal home visits to

customers, where they aggressively sold the Apple REITs.  DLA and the Individual DLA Defendants routinely represented that the Apple REITs were safe and conservative investments that would pay 8% returns and maintain their value (a constant $11 per share).

4.      Defendants promoted the Apple REITs to DLA's customers as having the same investment policies and objectives as a typical real estate investment trust.  The Apple REITs were marketed as investment vehicles that would acquire commercial properties, typically extended stay hotels, distribute income from those properties to the extent warranted by the profitability of the REIT's operations, and ultimately attempt to consummate a sale of the properties on advantageous terms at the expiration of a prescribed time period.  In the case of the Apple REITs, however, these investment objectives were at all times subordinated to the overriding objective of promoters Glade M. Knight and David A. Lerner of ensuring continued sales of the REITs by making periodic payments of "dividends" to investors for marketing purposes and without regard to profitability.

5.      Thus, each of the Apple REITS has paid a continuous stream of dividends and DLA and the Individual DLA Defendants have portrayed those dividends, in seminars, marketing materials, and sales presentations, as reflective of the successful operation of the Apple REITs and an indication that investment in an Apple REIT is desirable and appropriate for conservative investors.  Each of the Apple REITs has borrowed money and used the borrowed money, along with capital raised from investors, to pay investors back their own money in the form of distributions.

6.      DLA and the Individual DLA Defendants have promoted the ongoing sale of interests in the Apple REITs by touting the desirability of investing in the Apple REITs, and the Apple REITs have made these regular dividend payments, despite the fact that at no point in the

past seven years have any of the Apple REITs ever generated sufficient income from operations to make distributions to investors without either borrowing funds or paying back capital.  In order to continue the scheme, and to allow Defendants to continue to earn substantial commissions, management fees and transaction fees, the Apple REITs borrowed money and used those borrowed funds, along with investor funds, to pay the investors their own money back in the form of distributions. At the same time, DLA has repeatedly represented that "NO ONE HAS EVER LOST MONEY IN ANY OF THE APPLE REIT HOTEL PROGRAMS!"  In fact, investors who have acquired interests in the Apple REITs have incurred substantial unrealized losses because their interests are worth far less than the price paid by investors to acquire them.

7.     DLA and the Individual DLA Defendants have also consistently omitted or mischaracterized the actual risks and rewards of investing in the Apple REITs.  DLA recently acknowledged in writing that, "Regardless of age, in the main, Apple REIT investors seek attractive current returns and an alternative to experiencing stock market fluctuations."

8.     Investors in the Apple REITs paid DLA and the Individual DLA Defendants a 10% commission at inception and then paid substantial ongoing management and transactional fees to the various entities controlled by defendant Knight, who is also the Chairman and Chief Executive Officer for all of the Apple REITs.  These commissions and fees decreased the funds available for investment in real estate (by at least 12%) and made it unlikely, absent extraordinary appreciation in the value of the properties acquired by the REIT, that the Apple REIT would ever generate sufficient income from operations to pay investors the steady 8% returns they had been promised and return their principal once the Apple REIT could no longer return investors their own money in the form of dividends.  In consequence, an investment in the Apple REITs was highly speculative, and inappropriate for investors who sought attractive

4

returns.  Moreover, investments in the Apple REITs were in no meaningful sense protected from fluctuations in value, as they were almost certain to decline in value as a result of their dividend policies and fee structure.

9.     DLA and the Individual DLA Defendants sold shares in the Apple REITs by consistently omitting material risks and by making a uniform series of the same or similar false and misleading statements to DLA's customers, to whom they owed a duty of care through DLA's role as a financial advisor and registered broker-dealer.  Defendants' breaches of duty arise out of the failure to conduct adequate due diligence in connection with the Apple REIT offerings and failure to truthfully and accurately portray the risks and benefits of investing in the Apple REITs.  Specifically, DLA never advised its customers that (1) the Apple REITs expected to pay distributions through returns of capital and borrowing rather than income from the profitable operation of the business, and (2) the distributions paid by the Apple REITs were unsustainable over the duration of the anticipated life of each REIT and diminished the value of the shares each time a distribution was made out of capital rather than income from the profitable operation of the business.

10.    DLA and the Individual DLA Defendants made the following negligent misrepresentations, among others, concerning the Apple REITs:

a.     *Misrepresentations About Risks* - Defendants falsely represented to DLA's brokerage customers that the Apple REITs were safe and conservative investments that were consistently profitable and paid solid income returns of 7-8% to investors.

b.     *Misrepresentations About Artificial Prices/Value* - Defendants placed and sold the Apple REITs to DLA customers by falsely representing that prior Apple REITs had maintained a price of at least $11 per share.

c.      *Misrepresentations about Distributions* – Defendants falsely represented to DLA customers that the 8% returns, or yields, that customers would receive from their investment in Apple REIT shares were based on the profitable operation of the businesses.

d.      *Misrepresentations about Risks and Relative Safety* – Defendants falsely represented the risks and relative safety of the Apple REITs, particularly during the real estate market crisis from 2007 to present.   As the impact from the crisis hit the Apple REITs, Defendants made a uniform series of the same or similar misrepresentations to DLA's customers concerning: i) the declining true and accurate values of the Apple REITs; ii) the borrowing used to artificially maintain distributions paid at unsustainable rates; iii) the increasing risks associated with the Apple REITs as investments; and iv) prospective risks of future "mark downs", elimination of distributions, dilution for purchasers through the reinvestment plan, and other material risks.

11.     On May 31, 2011, DLA was sued by the Financial Industry Regulatory Authority ("FINRA"), its primary securities regulator, for its marketing and sale of Apple REIT Ten shares.  In that complaint, FINRA alleged that DLA mislead consumers by providing misleading performance figures for all of the Apple REITs on its website and implying that future investments could be expected to achieve similar results. The performance figures on DLA's website were further misleading because they did not say that the income from the Apple REITs was insufficient to support the 7–8 % returns paid by the REITs, and that the REITs had funded the distributions through borrowings.  Similar representations were made for the earlier Apple REIT offerings.

12.     The FINRA complaint asserts that the DLA website misleadingly characterized the source of the distributions as "net income and a return of capital, primarily in the form of

depreciation" when in fact the return of capital was not primarily from depreciation. In addition to these disclosure claims, the FINRA complaint asserts that DLA failed to investigate the Apple REITs adequately and had no basis for recommending and selling the REITS as suitable investments for its customers.

13. Plaintiffs are customers of DLA and investors in the Apple REITs and bring this action to recover losses and damages suffered as the result of Defendants' negligence and misrepresentations in the marketing and sale of Apple REIT shares.

## PARTIES

14. Plaintiffs Stanley and Debra Kronberg are citizens of the State of New Jersey, residing in Mahwah, New Jersey and invested in Apple REITs as a customer of DLA.

15. Defendant DLA New York corporation with its principal place of business at 477 Jericho Turnpike, Syosset, NY 11791 and maintains offices in Teaneck and Princeton, New Jersey, White Plains, New York, Darien, Connecticut, and Boca Raton, Florida. DLA is a privately held broker dealer that operates a total of six branches and has approximately 370 employees. It was founded by defendant David Lerner in 1976 that purports to specialize in fixed income, government bonds, and municipal bonds and conservative investments for individual investors and retirees. DLA is a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and has been a member of FINRA since 1976.

16. Defendant David Lerner is, upon information and belief, a citizen of the State of New York, and is the President and controlling owner of DLA. He has been censured at least four times and fined by the NASD. Two of these censures related to misrepresentations in connection with the sale of securities.

17.     Defendant Alan P. Chodosh is, upon information and belief, a citizen of the State of New Yor, and is the the Executive Vice President and Chief Financial Officer of DLA.

18.     Defendant John G. Dempsey Jr. is, upon information and belief, a citizen of the State of New York and is the Senior Vice President Sales of DLA. He has been censured at least twice by the NASD and was suspended by the NASD for a period of 30 days in 2005.

19.     Defendant Martin Lerner is, upon information and belief, a citizen of the State of New York and is the Executive Vice President of Sales of DLA. He has been censured and fined at least once by the NASD and was suspended by the NASD for a period of 20 days in 2006.

20.     Defendant Steven Sormani, is, upon information and belief, a citizen of the State of New York and is the Chief Compliance Officer of DLA.

21.     The Individual DLA Defendants are the senior officers, executives and principals of DLA. Because of their positions of control and authority as senior officers, executives and principals of DLA, the Individual DLA Defendants were able to and did control DLA's management and policies and its public statements concerning the Apple REITs. The Individual DLA Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes and transactions that are the subject of this lawsuit. The Individual DLA Defendants, and each of them, have participated in the improper acts or acted with or in furtherance of them, or aided or assisted in carrying out their purposes as alleged in this Complaint, and have performed acts and made statements in furtherance of the violations.

22.     Defendant Apple REIT Six, Inc. is a Virginia corporation with its principal place of business at 814 East Main Street, Richmond, Virginia 23219. Apple REIT Six was formed by defendant Knight in January 2004 and, through sales of shares, raised $1 billion by March 2006, at which time it was closed to new investors. Apple REIT Six is focused on the ownership and

8

operation of high-quality hotels.  From 2004 through 2010, Apple REIT Six earned net income of $268.8 million, but made distributions of $451.4 million, for a cumulative deficit of $182.7 million.

23.     Defendant Apple REIT Seven, Inc. is a Virginia corporation with its principal place of business at 814 East Main Street, Richmond, Virginia 23219.  Apple REIT Seven was formed by defendant Knight in May 2005 and, through sales of shares, raised $1 billion by June 2007, at which time it was closed to new investors.  Apple REIT Seven is focused on the ownership and operation of high-quality hotels.  From 2006 through 2010, Apple REIT Seven earned net income of $123.8 million, but made distributions of $301.1 million, for a cumulative deficit of $177.2 million.

24.     Defendant Apple REIT Eight, Inc. is a Virginia corporation with its principal place of business at 814 East Main Street, Richmond, Virginia 23219.  Apple REIT Eight was formed by defendant Knight in January 2007 and, through sales of shares, raised $1 billion by April 2008, at which time it was closed to new investors.  Apple REIT Eight is focused on the ownership and operation of high-quality hotels.  From 2007 through 2010, Apple REIT Eight earned net income of $36 million, but made distributions of $238.2 million, for a cumulative deficit of $202.2 million.

25.     Defendant Apple REIT Nine, Inc. is a Virginia corporation with its principal place of business at 814 East Main Street, Richmond, Virginia 23219.  Apple REIT Nine was formed by defendant Knight in November  2007 and, through the sale of shares, raised $2 billion by December 2010, at which time it was closed to new investors.  Apple REIT Nine is focused on the ownership and operation of high-quality hotels.  From 2008 through 2010, Apple REIT Nine

earned net income of $35.3 million, but made distributions of $188.5 million, for a cumulative deficit of $ 153.2 million.

26.      Apple REIT Ten, Inc. is a  Virginia corporation with its principal place of business at 814 East Main Street, Richmond, Virginia 23219.  Apple REIT Ten was formed by defendant Knight in August 2010 with the stated goal of raising a total of $2 billion through the sale of shares.  Apple REIT Ten has raised $300 million as of May, 2011.  Apple REIT Ten is focused on acquiring and owning hotels and other income producing real estate.

27.      Defendant Glade M. Knight is, upon information and belief, a citizen of the Commonwealth of Virginia, and is the Chairman and Chief Executive Officer of each of the Apple REITS.   He is also the owner of all of the related entities that provide property management, acquisition services and advisory, operational and managerial services to the Apple REITs in exchange for substantial commissions and fees.

### JURISDICTION AND VENUE

28.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d),  as the aggregate amount in controversy exceeds $5,000,000 and at least one class member is a citizen of a State different from a defendant, and more than one third of all Class members may reside outside of the State of New Jersey.

29.      Venue is proper under 28 U.S.C. §§ 1391(a) and (c) because the Defendants' unlawful course of conduct occurred in large part in this District. Venue is also proper because all Defendants transact or have transacted business in this District at times material to this action.

### FACTUAL ALLEGATIONS

30.      Pursuant to agency agreements entered into between DLA and the Apple REITs, DLA is the sole and exclusive selling agent for shares of the Apple REITs.

31.     DLA has a lengthy prior disciplinary and complaint history.  DLA is also currently being investigated by FINRA for, among other things, charging customers "excessive" markups on municipal bonds and high-grade mortgage-backed securities.

32.     DLA has been the subject of over a dozen regulatory actions by both the SEC and NASD (the predecessor to FINRA), which have led to censures, suspensions, and fines.  For example, in 2006, DLA was censured, suspended from conducting new business in variable annuities and variable life insurance for 30 days, and fined $400,000 for violations of New York State and NASD Regulations.  In 2005, DLA was censured and fined $115,000 for disseminating numerous statements and claims that were misleading, exaggerated or unwarranted through various media, including radio advertisements, investment seminars and other communications.[1]

33.     Twice this year, FINRA's Advertising Regulation Department has specifically warned DLA about its sales practices.  In regard to DLA's proposal to promote Apple REIT Ten using the returns of prior Apple REITs, on March 11, 2011, FINRA's Advertising Regulation Department issued a review letter advising DLA not to use a sales presentation DLA submitted for review, in part because it "contains and discusses returns of REIT programs that are no longer available."  As the Advertising Regulation explained, "the presentation is misleading, as it promotes investment in a new real estate program based on historical results of closed programs, contrary to Rule 2210(d)(1)."  When DLA submitted a revised version of these materials, along with the prospectus that would be provided during the presentation, Advertising Regulation

---

[1]     In a news release related to this fine, Barry Goldsmith, NASD Executive Vice President and Head of Enforcement, stated on September 30, 2005 that: "David Lerner Associates violated [NASD rules requiring firms to use accurate, fair and balanced communications when marketing their products and services] by making statements that investors would naturally be expected to rely upon, that were widely disseminated through the media, but which were exaggerated, misleading and unsupported by the facts."

noted in an April 13, 2011 letter that "the performance of prior REIT programs are not substantiated contrary to Rule 2210(d)(1)(A) and must be deleted . . . ."

34.     DLA has also been subject to dozens of customer complaints alleging damages of several million dollars in total, and have resulted in awards of hundreds of thousands of dollars against DLA.  The misconduct leading to these penalties includes failure to supervise, breach of contract, breach of fiduciary duty, manipulation, misrepresentation, negligence, suitability violations, unauthorized trading, and omission of facts.

**The Apple REITs as Represented**

35.     The Apple REITS are all ostensibly investment vehicles that permit investors to invest in large-scale income producing real estate.   The Apple REITs have invested almost exclusively in the same sector - extended stay hotels of only two national chains, Marriott and Hilton.

36.     The offer and sale of securities of each Apple REIT entity was registered with the SEC and each Apple REIT entity is a reporting, non-traded public company.  The Apple REIT shares do not trade on any securities exchange and are illiquid.  Defendant DLA is the sole and exclusive selling agent for shares of the Apple REITs.  All of the money raised by the Apple REITs through the sale of shares has come through the efforts of DLA and the Individual DLA Defendants, acting in their capacity as agents for defendants Knight and the Apple REITs.

37.     A REIT is an entity that owns and operates income-producing real estate. To qualify as a REIT, a company must have most of its assets and income tied to a real estate investment and must distribute at least 90 percent of its taxable income to shareholders annually in the form of dividends.   Therefore, in an ordinary REIT the distributions are funded by income producing properties.

38.     Each of the Apple REITs has represented that it has a value of $11 per share and that the share value has remained constant since the initial sales of shares to investors commenced with Apple REIT Six in 2004.  Account statements provided to DLA customers by DLA and the Individual DLA Defendants have always reflected the $11 per share price, notwithstanding years of market fluctuations, performance declines, increased leverage and excessive return of capital to investors.  As part of their sales pitch to entice new customers to invest in Apple REITs, Defendants have touted the stability of the $11 per share price for all of the existing Apple REITs.

39.     Each of the Apple REITs has, since inception, distributed 7–8 % returns to investors.  The Apple REIT websites (there is a specific website for each Apple REIT) describe the distributions as dividends.   The DLA monthly statements prepared by DLA and the Individual DLA Defendants describe the distributions as "yield" on the value of the investments.  These distributions were made even during performance declines and even before the Apple REITs acquired more than a handful of income-producing assets.  Defendants have touted this record of consistent prior distributions to entice customers of DLA to invest in Apple REITs.

40.     The DLA monthly statements also represent that the share values for the Apple REITS set forth in the monthly statements are calculated considering several factors, including the then current value of the assets in each Apple REIT, as follows:  "The per share estimated values for the Apple REIT securities are based on information provided by the issuer in the Annual Reports and are developed after considering, where appropriate: the current per share offering price; the per share price utilized in the issuer's dividend reinvestment and share redemption plans; and the value of the issuer's assets."

**Defendants' Sales Practices Regarding the Apple REITs**

41.    DLA's customers typically are retail investors and retirees.  DLA and the Individual DLA Defendants marketed and sold the Apple REITs to DLA's customers as conservative, safe, low risk investments.  These brokerage customers were attracted to the returns offered and perceived safety of investing in the Apple REITs based on Defendants' representations.

42.    DLA and the Individual DLA Defendants marketed the Apple REITs by general means such as the internet, radio, cold calling, mailings, and open invitation seminars at senior centers, retirement communities, and country clubs.  Defendants also made personal visits to customers where they actively sold the Apple REITs based on misleading information.

43.    All or nearly all of DLA's sales of the Apple REITs were solicited.

44.    DLA and the Individual DLA Defendants represented to potential investors that the Apple REITs were safe investments, but did not adequately disclose that the reported value of the prior Apple REITs was hypothetical.  The share price for each of the Apple REITs was arbitrarily set at $11 and the reported value did not fluctuate thereafter based on the market value of the REIT shares or the properties acquired by the REIT.  In fact, the value of the REITs fluctuated as a result of the substantial commissions and fees paid at the outset, declines in the value of the properties due to the economic downturn, borrowings and returns of capital to investors.

45.    For example, Apple REIT Eight, which to date has paid $120 million in commissions and fees and $200 million more in distributions than it has generated in income, has recently announced that has borrowed millions of dollars to continue to fund its operations and to

pay distributions and that it expects to default on five loans totaling $36.7 million and record an impairment loss of $7–11 million, yet its $11 per share valuation remains unchanged.

46.     DLA and the Individual DLA Defendants represented to potential investors that the Apple REITs paid a steady 7-8% return on investment, but did not clearly disclose that the Apple REITs paid those returns by borrowing money and paying back capital because income from operations was never sufficient to fund the distributions.  The Apple REITs never generated sufficient rental and other income from operations to pay distributions of 7-8%.  The Apple REIT website inocuously characterizes the source of the distributions as "net income and a return of capital, primarily in the form of depreciation" when in fact the return of capital was not primarily from depreciation.  The Apple REITs disguised their failure to generate sufficient income by borrowing money and continuing to pay distributions of 7-8% from borrowings and/or return of capital.  Any reference to a 7-8% return on investment thus was inherently misleading because the Apple REITs were not distributing income from successful operations but rather were paying investors with their own money and in the process decreasing the capital of the business.

47.     DLA and the Individual DLA Defendants represented to potential investors that the Apple REITs paid a steady 7-8% return on investment, but did not disclose that the payments decreased recently.  DLA's website currently provides a page titled "REIT History at David Lerner Associates."  The website provides return information for each previously offered Apple REIT in a misleading manner. Although the recitation of "REIT History" includes year-by-year "annual yields" for the earliest REITs, it only provides a single figure, "average annualized distribution" since inception, for Apple REITs Six through Nine.  Describing the performance of

Apple REITs Six through Eight using average distribution since inception is misleading, because it masks that distribution rates for those REITs were cut in May 2010.

**Sales of Shares in the Apple REITs through the Dividend Reinvestment Plan**

48.     Each of the Apple REITs provides for dividend reinvestment at $11 per share through its Dividend Reinvestment Plan ("DRIP").  DRIP reinvestment is unlimited, and DRIP investment by investors has been as follows:

| Issue | Year | DRIP ($) Invested |
|---|---|---|
| Apple REIT 6 | 2007 | $33 million |
|  | 2008 | $35 million |
|  | 2009 | $35 million |
|  | 2010 | $30 million |
| Apple REIT 7 | 2008 | $28 million |
|  | 2009 | $25.9 million |
|  | 2010 | $24.6 million |
| Apple REIT 8 | 2008 | $16 million |
|  | 2009 | $26.8 million |
|  | 2010 | $26.1 million |

49.     Investors in the Apple REITs needed timely and accurate information about the financial condition and value of the Apple REITs to make decisions about whether to remain in the DRIP.  Defendants provided misleading information about the value of shares in the Apple REITs, stating that shares had a constant value of $11 per share, and provided misleading information about the distributions, keeping the distribution rate at 7-8% and suggesting that the Apple REITs were generating enough income to make those distributions.

**The Actual Operations and Financial Status of the Apple REITs**

50.     Since April 2004 the general economy and market in which the Apple REITs invest has undergone substantial market fluctuation.  For example, the sector in which Apple

REITs invest, extended stay hotels, suffered a significant, material downturn beginning at least in 2007 due to the overall economy.

51.     As a result, certain assets acquired by the Apple REITS may have experienced declines in market value.  A decline in value of a property or a decrease in rental income would normally influence a REIT's dividend policy and the market value of its shares.  Because Defendants paid distributions to Apple REIT investors without regard for the profitability of the properties and reported a single value for the Apple REIT shares, investors have continued to invest in ongoing offerings of Apple REIT shares and participate in the DRIP.

52.     The Apple REITs use Funds from Operations ("FFO")[2], a non-GAAP measurement, in their public financial documents as a means to calculate income generated by properties that support distributions.  Because 90 percent of a REIT's taxable income must be distributed to investors, a REIT that makes distributions that are fully covered by income will have a distribution/FFO payout ratio of approximately 90–100 percent or less.

53.     Since at least as early as 2008, Apple REITs Six through Nine did not achieve anywhere near the FFO necessary to pay investors the expected 7–8% returns and the payout ratio nearly always exceeded 100 percent.  In fact, "cumulative distributions greater than net income" steadily worsened.[3]

54.     The Apple REITs were able to make distributions — 8 % at the outset, reduced to 7 or 7.2 % in May 2010 — that well exceeded FFO in two ways.  First, the Apple REITs borrowed funds and used the loan proceeds to fund the distributions.  For example, in October 2010, shortly before defendants began selling Apple REIT Ten, Apple REIT Eight opened a $75

---

[2]     FFO as defined by NAREIT, means net income, computed in accordance with U.S. GAAP, excluding gains (or losses) from sales of real estate, plus real estate depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures.

[3]     Using a GAAP measurement, the numbers are significantly worse.

million credit line "for general corporate purposes, including capital expenditures, redemptions and distributions." As recently as April 19, 2011, Apple REIT Eight secured a $20 million loan, secured by a personal guarantee from the Apple REITs' founder for "working capital purposes, including the payment of redemptions and distributions."

55. Second, the Apple REITs made up the difference by including a return of capital to investors. In other words, to maintain an artificially high return on investment, the Apple REITs made a return of investment with the monthly dividend. Returning capital to investors and taking on debt (which must be serviced out of future income and new investor proceeds) would reduce the REIT's ability to acquire income producing assets to generate future income for distribution to investors. Increasing leverage in this manner decreased the REIT's ability to maintain distribution levels in the future and reduced the value of the REIT.

**DLA and the Individual DLA Defendants Failed to Conduct Adequate Due Diligence**

56. DLA and the Individual DLA Defendants knew or should have with adequate due diligence known that market conditions were affecting the value of the Apple REITs. Most or all of the data reflecting market conditions was available in public filings by the Apple REITs. The failure of Apple REITs Six through Nine to adjust their uniform $11 valuations notwithstanding changes in market conditions and each REIT's financial condition and results of operations was a red flag requiring DLA and the Individual DLA Defendants to conduct a reasonable investigation. DLA and the Individual DLA Defendants nevertheless sold and continue to sell Apple REITs without having conducted adequate due diligence to properly advise DLA's customers.

57. Because DLA was the sole selling agent for the Apple REITs, DLA and the Individual DLA Defendants were required to conduct proper due diligence in connection with

the offerings.  In addition, through DLA's position as sole selling agent of Apple REITs, DLA and the Individual DLA Defendants were uniquely empowered and had the duty to conduct thorough due diligence of each Apple REIT prior to selling it to customers.  For example, pursuant to an agency agreement with each of the Apple REITs, DLA can request certain non-public information concerning the "business and financial condition" of the Apple REITs.  DLA and the Individual DLA Defendants did not sufficiently avail themselves of this opportunity.

58.     Instead, the only due diligence DLA and the Individual DLA Defendants have performed has consisted of reviewing public filings (which themselves raised red flags), briefly meeting with the management of the Apple, and performing inadequate analyses that, among other failures, do not sufficiently address any of the red flags identified above.

59.     Had DLA and the Individual DLA Defendants conducted sufficient and meaningful due diligence with a view toward advising DLA's customers, they would have concluded that the Apple REITs were not accurately priced, the distributions were not sustainable, and the Apple REITs were not the safe and conservative income investments that had been recommended to investors.

### Defendant Knight and the Apple REITs are Responsible for the Actions and Representations of DLA and the Individual DLA Defendants Regarding the Sales of Apple REIT Shares

60.     Since at least 2004, DLA has served as the sole selling agent for each of the Apple REITs.  The agreements between DLA and each of the Apple REITs regarding the sale of shares are titled "Agency Agreement."  In those agreements the Apple REITs engaged DLA to solicit purchasers for shares in the Apple REITs.

61.     The financial fortunes of defendant Knight and the Apple REITs and DLA and the Individual DLA Defendants are intertwined.  DLA and the Individual DLA Defendants have sold more than $6 billion of Apple REIT securities into approximately 122,600 customer

accounts in DLA's role as exclusive selling agent of the offerings.  DLA's brokerage customers represent a captive sales market for defendant Knight and the Apple REITs.

62.    DLA and the Individual DLA Defendants earn a 10 percent fee or commission on all offerings of Apple REIT securities, composed of 7.5 percent in commissions and 2.5 percent in selling fees.

63.    Defendant Knight and the Apple REITs have relied on DLA and the Individual DLA Defendants as the sole selling agent for their shares.  Therefore, defendant Knight and the Apple REITS have been, and continue to be, wholly dependent on DLA and the Individual DLA Defendants for their funding.   In the same time period, income related to the Apple REITs (more than $600 million to date) has represented 60-70% of DLA's business annually.

64.    DLA and the Individual DLA Defendants made repeated multi-year representations to the public, Plaintiffs, and the proposed Class on behalf of defendant Knight and the Apple REITs.  Defendant Knight and the Apple REITs knew or should have known that the public, Plaintiffs, and the proposed Class were relying on DLA and the Individual DLA Defendants' representations about the operations and financial condition of the Apple REITS, but they took no action to correct these misrepresentations and omissions.

65.    The Apple REITs and DLA have integrated their presentations to the public.  The website for the Apple REIT Companies (wholly owned by defendant Knight) has a page captioned "CONTACT US" that identifies David Lerner Associates as a contact for inquiries concerning Apple REIT shares.  A visitor to the Apple REIT Companies website who clicks on the contact information for David Lerner Associates will be taken directly to a DLA website page touting the Apple REITs.

66.     The websites for each of Apple REIT Six, Apple REIT Seven, Apple REIT Eight, and Apple REIT Nine have pages captioned "CONTACT US" and each such page identifies David Lerner Associates as a contact for inquiries concerning Apple REIT shares.   The "CONTACT US" web pages each invite viewers to obtain SEC filings about those entities directly from the relevant entity.   Given that the Apple REIT Six, Apple REIT Seven, Apple REIT Eight, and Apple REIT Nine are each closed to new investors and information about those entities can be obtained directly from them, the only apparent purpose of the link to DLA is to direct potential investors to DLA for the sale of shares in new Apple REITs.

67.     The DLA website prominently displays information about the Apple REIT Companies and suggests that the Apple REITs have been and will continue to be safe investments. Consistent with the Apple REIT Companies providing a link to the DLA website, the DLA website states, "Visit the Apple REIT Companies website," which provides a link to the homepage for the Apple REIT Companies.

68.     The websites for the Apple REIT Companies and for each of the Apple REITs do not identify any sources of information about shares in the Apple REITs other than DLA. Similarly, the DLA website does not identify any specific investments other than the Apple REIT Companies and DLA's proprietary "Spirit of America" mutual funds.

69.     Through the agency agreements and the close relationship suggested by the volume of business and the interlinked web pages, DLA has assumed the role of the agent of the Apple REITs regarding the sale of shares in the Apple REITs.   The Apple REITs are responsible for the actions of DLA because (1) the Apple REITs expressly make DLA their agent regarding the sale of shares in the REITs and (2) the Apple REITs have through their words, conduct, and other manifestations held out DLA as their agent.

## CLASS ACTION ALLEGATIONS

70.   This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

### Class Definition

71.   The proposed Class (the "Class") is defined as follows:

> All persons and entities that purchased, subscribed and paid for, or otherwise acquired shares in Apple REIT Six, Apple REIT Seven, Apple REIT Eight, Apple REIT Nine, or Apple REIT Ten that were offered and sold to them by David Lerner Associates, Inc., or its affiliates.  The class includes persons and entities who acquired the shares through any means, including share rollovers and dividend reinvestment programs.

72.   Excluded from the class are: Defendants, any judge or judicial officer who may hear any aspect of this case (and his or her law clerks), and any person, firm, trust, corporation, or other entity related to or affiliated with any of Defendants.

### Numerosity

73.   DLA served as a custodian for hundreds of brokerage accounts and IRA and retirement custodial accounts affected by the wrongdoing described herein.

74.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members remains unknown at this time, Plaintiffs believe there are, at a minimum, hundreds of members of the proposed class.  The exact number of such accounts is within the knowledge of DLA.

### Commonality

75.   There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class including, *inter alia*:

   a.   Whether Defendants negligently misrepresented the nature and risks associated with the Apple REIT securities placed or sold by them;

b. Whether Defendants negligently misrepresented the true and accurate value or estimated value of the Apple REIT securities purchased or held by DLA's customers;

c. Whether Defendants had a duty to the members of the Class;

d. Whether Defendants breached duties owed to Plaintiffs and the Class by failing to conduct their operations in conformity with the requirements of the law and applicable regulations;

e. Whether statements or omissions made by Defendants to investors misrepresented material facts about the Apple REITs;

f. Whether Defendants' negligence entitles Plaintiffs and members of the Class to damages for the loss of the amounts invested by Plaintiffs and members of the Class;

g. Whether Defendants were unjustly enriched at the expense of Plaintiffs.

h. What remedies are appropriate compensation for the damages caused to Plaintiffs and each member of the Class; and

i. Whether the Plaintiffs and members of the Class are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

## **Typicality**

76. The claims of Plaintiffs are typical of the claims of all Class members. Plaintiffs are situated identically to all members of the Class with respect to the issues presented in this case. The claims of Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

77. All persons maintaining brokerage or retirement accounts with DLA, which were invested in the Apple REITs, have been adversely affected by the wrongdoing of Defendants as described herein.

## **Adequacy of Representation**

78. Plaintiffs will adequately represent and protect the interests of the Class and have no interests that conflict with or are antagonistic to the interests of the Class.

79. Plaintiffs have retained attorneys who are experienced and capable of prosecuting complex litigation such as this case. The attorneys for Plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof. The attorneys for Plaintiffs have adequate resources, experience and commitment to litigate this matter.

### Predominance and Superiority

80. A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and undesirable for each of the individual Class members who have suffered damages to bring separate actions. Moreover, Defendants have acted and will continue to act on grounds generally applicable to the Class, thereby making appropriate final relief with respect to the Class as a whole.

81. The prosecution of separate claims or defenses by or against individual members of the Class would also create a risk of adjudications concerning individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests.

### COUNT ONE
### (Negligent Misrepresentation)

82. Plaintiffs and the Class repeat the allegations contained in the foregoing paragraphs as if set forth fully herein.

83. Defendants owed Plaintiffs duties of ordinary and reasonable care which arose from the relationships between DLA and its customers and DLA's position and status as the sole selling agent of the Apple REIT securities, as a financial advisor to its customers and as a

registered broker-dealer.  Defendants owed duties of ordinary and reasonable care applicable to any similar financial firm or securities broker-dealer and FINRA member.

84.     Defendants breached the duties and obligations of ordinary care by, *inter alia,* negligently making numerous false and misleading misrepresentations about the Apple REITs to DLA customers concerning the $11 per share valuation, the track record of distributions, the liquidity of the securities, their safety and conservative nature as an investment, and their true economic performance.

85.     Plaintiffs and the Class justifiably relied on the statements made by DLA in its sales of stock in the Apple REITs. Similarly, Plaintiffs and the Class justifiably relied on the ongoing statements made by DLA in their decisions to continue participation in the DRIP.

86.     As a result of Defendants' breaches of their duties of ordinary care, Plaintiffs and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT TWO
### (Negligence)

87.     Plaintiffs and the Class repeat the allegations contained in the foregoing paragraphs as if set forth fully herein.

88.     Defendants owed Plaintiffs and the Class a duty to exercise ordinary and reasonable care with respect to accounting for the value of the Apple REITs held in the accounts of Plaintiffs and members of the Class.

89.     Defendants were negligent and breached their duty to exercise reasonable care by: (a) their failure to perform sufficient review and due diligence of the Apple REITs to ensure that the account statements sent to Plaintiffs and members of the Class did not report false and deceptive values; (b) perform due diligence on the Apple REITs so that they could

truthfully and accurately advise DLA's customers without misleading them in any fashion; and (c) disclose all material facts pertaining to the Apple REITs to DLA's customers.

90.     As a FINRA member, DLA was subject to the by-laws, Rules and Notices issued by its primary regulator.  In addition, the Agency Agreements between the Apple REITS and DLA state that DLA will comply with the securities law of all jurisdictions in which the securities are offered and all applicable rules of the FINRA.  The rules of FINRA establish the standard of care to which its members must adhere.  In Notice to Members 01-08, FINRA announced revisions to Rule 2710 governing "Corporate Financing Rule – Underwriting Terms and Arrangements".  The revisions added the following subpart to Rule 2710 so that it provided as follows:

> **(6)          Unreasonable Terms and Arrangements**
>
> (B) Without limiting the foregoing, the following terms and arrangements when proposed in connection with the distribution of a public offering of securities, shall be unfair and unreasonable:
>
> > (xv) for a member or person associated with a member to participate in a public offering of real estate investment trust securities, as defined in Rule 2340(c)(4), unless the trustee will disclose in each annual report distributed to investors pursuant to Section 13(a) of the Act a per share estimated value of the trust securities, the method by which it was developed, and the date of the data used to develop the estimated value.

91.     DLA participated in public offerings of all of the Apple REITs despite the fact that the offerings do not disclose to investors an annual per share estimated value as described in this Rule that was developed by a reasonable method and current data.

92.     In February 2009, FINRA issued its Notice to Members 09-09, which stated that Rule 2340(c)(2) prohibits member firms from reporting to customers estimated values based on data that is more than 18 months old.  Defendants were required to conduct due diligence and

their own appraisal of the Apple REITs after 18 months from the completion of the offerings, so that DLA could provide a truthful and accurate estimated value for investors of the share price. DLA failed to comply with the standard set by NTM 09-09.

93.     DLA also violated each of the following FINRA rules and regulations:

- FINRA Rule 2010, which provides that "[a] member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade."

- FINRA Rule 2020, which provides that "[n]o member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

- NYSE Rule 401, which provides that "[e]very member, allied member and member organization shall at all times adhere to the principles of good business practice in the conduct of his or its business affairs."

- NYSE Rule 405, which requires every member to "[u]se due diligence to learn the essential facts relative to every customer, every order … [and] every account accepted or carried by such organization."

94.     In addition to its role as selling agent, DLA also served as the custodian under Internal Revenue Code Section 408 for Class members who held Individual Retirement Accounts ("IRAs").  While serving as the IRA custodian, DLA periodically sent statements to each Class member with an IRA account reporting that the Apple REITs had retained their original share price value of $11 per share.  Defendants knew or should have known, however, that the true value of the REITs was in fact far less than the $11 per share price reflected on DLA's statements.

95.      DLA breached its duties as custodian to Class members who held IRA accounts in that DLA: (1) violated 26 C.F.R. § 1.408-2(e)(5)(vi)(C) and (D) by failing to determine, not less than once during each three-month period, the value of the assets in the IRA and other pension accounts of Class members as of the date of such valuation, and by

failing to "cause an adequate audit to be made" of the IRA and other pension accounts of Class members "by a qualified public accountant"; (2) failed to value Class member's assets in accounts on behalf of Class members, and (3) failed to send Class members statements reflecting the true values of the assets DLA held on Class members' behalf.

96.     As a result of breaches of their duties of care by Defendants, Plaintiffs and the members of the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

## COUNT THREE
### (Unjust Enrichment)

97.     Plaintiffs and the Class repeat the allegations contained in the foregoing paragraphs as if set forth fully herein.

98.     By their wrongful acts and omissions alleged above, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiffs and the Class.

99.     As a result of the misconduct detailed herein, Plaintiffs and the Class have illiquid investments in the Apple REITs that are not worth the value reported and are contrary to the descriptions and understanding of the investments as sold to them.  In contrast, Defendants reaped substantial fees and other pecuniary benefits totaling well in excess of $1 billion at the expense of Plaintiffs and the Class.

100.    Defendants have therefore been unjustly enriched and equity and good conscience require that these Defendants disgorge to Plaintiffs and the Class all such unjust enrichment in an amount to be determined at trial.

101.    Plaintiffs and the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Defendants from their wrongful conduct.

WHEREFORE, Plaintiffs and Class members demand judgment against Defendants as follows:

(1)     for an order certifying the Class as defined herein and appointing Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(2)     for compensatory, special and general damages according to proof;

(3)     for prejudgment interest;

(4)     for appropriate equitable relief;

(5)     for reasonable attorneys' fees and costs of investigation and litigation; and

(6)     for such other and further relief as the interests of law or equity may require.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiffs

By:___/s/ James E. Cecchi_____
        JAMES E. CECCHI

DATED:  June 20, 2011

| | |
|---|---|
| Jacob H. Zamansky | Jonathan K. Levine |
| Edward H. Glenn, Jr. | GIRARD GIBBS LLP |
| Kevin D. Galbraith | 711 Third Avenue, 20th Floor |
| Daniel Fried | New York, New York 10017-4036 |
| ZAMANSKY & ASSOCIATES LLC | (212) 867-1721 |
| 50 Broadway, 32nd Floor | |
| New York, New York 10004 | Daniel C. Girard |
| (212) 742-1414 | GIRARD GIBBS LLP |
| | 601 California Street, 14th Floor |
| David P. Meyer | San Francisco, California 94611 |
| Matthew R. Wilson | (415) 981-4800 |
| DAVID P. MEYER & ASSOCIATES, LPA | |
| 1320 Dublin Road, Suite 100 | |
| Columbus, Ohio 43215 | |
| (614) 224-6000 | |

Attorneys for Plaintiffs

## JURY DEMAND

Plaintiffs hereby demand trial by a jury as to all issues so triable issues.

> CARELLA, BYRNE, CECCHI,
> OLSTEIN, BRODY & AGNELLO
> Attorneys for Plaintiffs
>
> By:    /s/ James E. Cecchi
>        JAMES E. CECCHI

DATED:  June 20, 2011


Jacob H. Zamansky
Edward H. Glenn, Jr.
Kevin D. Galbraith
Daniel Fried
ZAMANSKY & ASSOCIATES LLC
50 Broadway, 32nd Floor
New York, New York 10004
(212) 742-1414

David P. Meyer
Matthew R. Wilson
DAVID P. MEYER & ASSOCIATES, LPA
1320 Dublin Road, Suite 100
Columbus, Ohio 43215
(614) 224-6000

Jonathan K. Levine
GIRARD GIBBS LLP
711 Third Avenue, 20th Floor
New York, New York 10017-4036
(212) 867-1721

Daniel C. Girard
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, California 94611
(415) 981-4800

Attorneys for Plaintiffs